IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

```
_____
                                )
ELIZABETH-ANN K. MOTOYAMA,       )
                                )
          Plaintiff,             )
                                )
     vs.                         )   Civ. No. 10-00464 ACK-RLP
                                )
STATE OF HAWAII, DEPARTMENT OF   )
TRANSPORTATION; GLENN OKIMOTO,   )
in his official capacity; JOHN   )
DOES 1-10; JANE DOES 1-10; DOE   )
GOVERNMENT AGENCIES 1-10; DOE    )
CORPORATIONS 1-10; DOE           )
PARTNERSHIPS 1-10; DOE           )
INDIVIDUALS, 1-10,               )
                                )
          Defendants.            )
_____ )
```

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### PROCEDURAL BACKGROUND

On August 11, 2010, Plaintiff Elizabeth-Ann K. Motoyama ("Plaintiff"), appearing pro se,[1] filed a complaint against the Hawaii Department of Transportation ("HDOT"), alleging employment discrimination. On August 15, 2011, Plaintiff filed a Second Amended Complaint ("SAC") against the HDOT and Glen Okimoto, in his official capacity as current Director of the HDOT (together, "Defendants"). Doc. No. 56. The Second Amended Complaint asserts claims of unlawful retaliation under 42 U.S.C. § 2000e,

_____

[1] On November 30, 2010, counsel appeared on behalf of Plaintiff. Doc. No. 12. On April 4, 2011, the Court granted counsel's request to withdraw. Doc. No. 30. Plaintiff has proceeded pro se since that time.

et seq. ("Title VII") (Count I), disability discrimination under the ADA (Count II), and violation of the Equal Protection Clause of the U.S. Constitution (Count III).  SAC ¶¶ 153-65.  Plaintiff seeks, inter alia, special, general, and consequential damages, back and front pay, lost employment benefits, and reinstatement to her position.  Id. Prayer for Relief.

On November 28, 2011, Defendants filed a motion for summary judgment ("Defs.' Mot.").  Doc. No. 81.  The Motion was accompanied by a memorandum in support ("Defs.' Mot. Mem."), a concise statement of facts, Declarations of Lisa Dau, Melanie Martin, Ben Gorospe, Maria C. Cook, and exhibits A-KK.  Doc. Nos. 81-83.  The next day, Defendants filed an amended concise statement of facts ("Defs.' CSF").  Doc. No. 85.  On March 6, 2012, Plaintiff filed an opposition to Defendants' Motion ("Pl.'s Opp'n") and an opposition to Defendants' CSF ("Pl.'s CSF").  Doc. Nos. 105 & 106.  On March 7, 2006, Plaintiff filed exhibits A-V, and declarations of Hui-Hsiang Hsu, Jessica L. Kepilino, Karl K. Motoyama, and Plaintiff.  Doc. No. 107.  On March 13, 2012, Defendants filed a reply ("Defs.' Reply"), which was accompanied by exhibits MM-PP.  Doc. No. 108.  The Court held a hearing on Defendants' Motion on March 27, 2012.

**FACTUAL BACKGROUND**[2/]

---

[2/]The facts as recited in this Order are for the purpose of disposing of the current motion and are not to be construed as findings of fact that the parties may rely on in future

On September 18, 2007, the HDOT hired Plaintiff as an
Equal Employment Opportunity ("EEO") Specialist for the Office of
Civil Rights ("OCR").[3/]  Defs.' Mot. Mem. 3.  Plaintiff was
injured in a motor vehicle accident shortly thereafter and was on
extended leave for medical reasons from October 4, 2007, through
January 7, 2008.  The injuries resulted in substantially limiting
Plaintiff's mobility.  SAC ¶ 32.

I.   **Plaintiff's Requested Accommodations**

Plaintiff asserts that while on medical leave, she
contacted Ben Gorospe, the ADA Specialist in the HDOT's OCR, to
inquire about reasonable accommodations under the ADA.  SAC ¶ 33.
Specifically, Plaintiff asked about access to an accessible
restroom and a parking space in close proximity to her office.
Id.  According to Plaintiff, Gorospe told her that a nearby
parking space was "not available," and that the first floor
restroom, the same floor where Plaintiff's office is located,
could not be fitted to become compliant with ADA accessibility.
Id. ¶ 35.  He told her that she could use the restroom on the
third floor, which is ADA compliant.  Id.  Plaintiff asserts
Domingo also told her the first floor restrooms could not be ADA-
fitted.  Id. ¶¶ 38-39.

───────────────

proceedings.

[3/]Plaintiff asserts that the HDOT hired her as a "Civil
Rights Specialist V" but that it changed her title to EEO
Specialist in December 2008.  SAC ¶ 21.

On April 23, 2008, Plaintiff submitted a Report of Work Capabilities, prepared by Dr. Joseph DiCostanzo, to her supervisor, Rey Domingo, that stated Plaintiff should be permitted a flexible schedule to complete a full eight-hour workday due to the extra time needed to travel to the restroom. Defs.' Mot. Exs. G & I.  Domingo asserts that Plaintiff was granted the flex time between April 23 and April 28.  Defs.' Mot. Declaration of Rey Domingo ("Domingo Declaration") ¶ 10. According to Plaintiff, Domingo did not grant morning flex-time until June 27, 2008, but "denied extended time in the afternoons by openly complaining and on occasion, instructing her to go home prior to the end of an eight hour work day."  Pl.'s CSF ¶ 14.

On April 28, 2008, Plaintiff sent a memorandum to her co-workers, Melanie Martin and Gorospe, who were acting supervisors during Domingo's absence, with a list of her physical injuries and the Report of Work Capabilities attached.  Defs.' Mot. Ex. I.  In the memorandum, she stated that she would like to call Martin and Gorospe's attention to provisions which might affect their supervision and work day schedule.  Id. Particularly, she explained that "even if I start work at 7:45 am, due to my restroom travels and Vertigo, I will need additional time beyond 4:30 pm to put in an eight-hour work day," and "I have actually been doing that on certain days in the past; however, it is now officially an accommodation for my

4

disability."  Id.

In April 2008, Domingo provided Plaintiff with a parking accommodation request form, and Plaintiff returned the completed form to Domingo on May 2, 2008.  SAC ¶ 40.  Plaintiff was contacted by Lisa Dau, the Business Office ("BUS") Manager, who stated she handled the parking for the HDOT employees.  Id. ¶ 41.  Dau received Plaintiff's form and Report of Work Capabilities on May 2, 2008.  Defs.' Mot. Declaration of Lisa Dau ("Dau Declaration") ¶ 5.  The Report of Work Capabilities verified Plaintiff's accommodation was needed, but did not contain an identifiable period of time for the accommodation as required by regulation.  Id. ¶ 6.  On May 16, 2008, Dau received the necessary information from Plaintiff's treating physician. Id.  On May 20, 2008, Dau approved Plaintiff's application.  Id. ¶ 7.  Because of the resurfacing of several parking lots, however, no parking was available at that time.  Defs.' Mot. Mem. 5.  Dau placed Plaintiff in the "Priority List" for a parking space, ahead of other employees who had been waiting for years. Id.  A parking space became available on August 1, 2008, and on that day, Plaintiff was assigned a parking space behind the building where she worked.[4]  Defs. Mot. Ex. R, at 28.

_____

[4]In her Second Amended Complaint, Plaintiff asserts that she did not receiving parking in close proximity until August 4, 2008.  SAC ¶ 44.  Defendants' exhibits show that a parking stall was provided on August 1, 2008.  In any event, this minor discrepancy does not affect the instant decision.

In an e-mail to Domingo dated July 22, 2008, and with the subject line "Confidentiality and Printers," Plaintiff requested a printer at her desk based on privacy concerns with others reading the documents she printed to the shared printer in the OCR office.  See Defs.' Mot. Ex. M, at 1-2.  Although not mentioned in her e-mail request, Plaintiff claims she also requested a personal printer because of the "difficulty she experienced repeatedly lifting herself out of her chair."  Pl.'s Opp'n 16.  Domingo asserts that Plaintiff did not ask for a printer as an accommodation, but only for privacy concerns. Domingo Declaration ¶ 12.  He further declared that he did not grant her request "because there was no issue of privacy and confidentiality."  Id.

Plaintiff submitted an updated accommodation request in February 10, 2009, stating that "[t]he main difference from last year" was a request for a computer glare screen, a leg rest, and a lumbar support cushion for her desk chair.  Defs.' Mot. Ex. L. E-mails establish that on February 12, 2009, Plaintiff was given a leg rest and Domingo requested that a computer glare screen and lumbar support cushion be purchased for her.  See Defs.' Mot. Ex. E, at 55-57.  Plaintiff asserts that she received a broken leg rest, a broken glare screen that had to be taped in place, and never received the lumbar support cushion.  Pl.'s Opp'n 17. Defendants submitted a declaration by Domingo that Plaintiff was

6

given a computer glare screen, a foot rest, and a lumbar support cushion for her chair.  Domingo Declaration ¶ 11.

## II.  Plaintiff's Investigation of Employee Complaints

Plaintiff's retaliation claims are based on her investigation of seven complaints by employees that she investigated as part of her job duties.  Plaintiff's Title VII claims are based on five investigations and her ADA claims are based on two investigations.[5]

### A.  Alleged Title VII Investigations

Plaintiff investigated two complaints filed by J.S. on September 14, 2007, and June 26, 2008, which was "a combination of whistle-blowing and a workplace violation."  Defs.' Mot. Ex. D., Deposition of Motoyama ("Pl.'s Dep."), 44:5-9.  Plaintiff

---

[5] In Plaintiff's opposition, she states that her claim is actually based on fourteen investigations and that Defendants "purposely distracted this Court by mentioning only five (5) investigations, and excluding the other nine (9)."  Pl.'s Opp'n 20.  Plaintiff, however, stated in her answer to interrogatories that her retaliation claims were based on the investigations of J.S., H.H., C.D., M.Y., and J.K.  See Defs.' Mot. Ex. F.  In Plaintiff's opposition, the only additional investigations she discusses is of complaints by R.S and G.P.  Pl.'s Opp'n 21.  Defendants assert that Plaintiff has not amended her answers to their interrogatories to add other investigations, and thus the Court should not give the additional investigations any weight.  Defs.' Reply 7.  Given Plaintiff's pro se status and in an abundance of caution, the Court will consider Plaintiff's investigation of the complaints by R.S. and G.P.  Plaintiff provided a monthly activity log from December 2008 that mentions other investigations she was working on.  See Pl.'s Ex. M.  Because Plaintiff has not discussed these other investigations, or provided factual details about them, the Court will not consider them.

made no findings or conclusions regarding this investigation because J.S. withdrew his complaints.  Id. at 48:10-11, 12-23.  She asserts that Administrative Services Officer Gerald Dang ignored her efforts to resolve the problem and "began to shun her."  SAC ¶ 96.

In March 2008, Plaintiff was assigned to investigate a complaint in which H.H. alleged that another employee had sexually harassed her.  Pl.'s Opp'n 22; Defs.' Ex. F, at 8.  A settlement agreement between H.H. and the other employee resulted in H.H. closing her complaint.  Pl.'s Opp'n 22.  After the other employee allegedly breached the settlement agreement, H.H. returned to Plaintiff to file another complaint.  Id.  Plaintiff assisted H.H., with Domingo's permission, in writing her complaint due to H.H.'s difficulties with English.  Id.  Plaintiff "typed it out for [H.H.] for [Plaintiff's] purposes, for [Plaintiff's] file."  Pl.'s Dep. 50:13-13.  H.H. informed Plaintiff that she intended to file an EEOC Charge.  Id. at 51:7-10.  Upon H.H.'s request, and with permission of Domingo, Plaintiff allowed H.H. to take the statement Plaintiff wrote.  Id. at 51:14-20.  "To [Plaintiff's] shock," H.H. used the typewritten statement as her EEOC charge.  Id. at 53:4-12.  Subsequently, at an OCR meeting, Martin "chastised [Plaintiff] for assisting [H.H.] and for advising her of her alternatives for filing a complaint."  Pl.'s Opp'n 22.

8

In July 2008, C.D. filed a sexual harassment complaint against N.S.  Defs.' Mot. Ex. F, at 9.  Plaintiff asserts that this complaint was removed from her and "Domingo refused to intervene" to prevent the removal.  Pl.'s Opp'n 24.

In April 2008, M.Y., a non-employee, filed a complaint, asserting that she was discriminated against based on her sex and marital status by the Materials Testing and Research Branch ("MTRB") when she was denied a research grant application. Defs.' Mot. Ex. F, at 10.  After investigation, Plaintiff found that M.Y. was not discriminated on the basis of gender or marital status, but that she did receive disparate treatment "due to a reason other than her membership in a protected class."  Id. Plaintiff asserts that after she followed up on a settlement agreement with MTRB staff regarding this complaint, Domingo told her not to contact MTRB anymore.  Id. at 10-11.  Plaintiff asserts that "[t]his eroded [her] ability to have any respect or acknowledgment in the way of a response from MTRB."  Id. at 11.

Plaintiff asserts that she handled a complaint M.E. filed for workplace violence and age discrimination against his supervisor.  Pl.'s Opp'n 24.  Plaintiff asserts that meetings regarding this complaint "proved futile," and that after Plaintiff was discharged, M.E. retired due to continuing harassment.  Id.

**B.   Alleged ADA Discrimination Investigations**

9

Plaintiff's ADA retaliation claim is partly based on her "taking the complaint allegations of [J.K.] on December 19, 2008." Defs.' Mot. Ex. F., at 9; see Pl.'s Opp'n 18-20. Plaintiff asserts that Dau retaliated against her for taking such allegations by having "the intake allegations taken away from [Plaintiff]." Defs.' Mot. Ex. F, at 9.  J.K. eventually filed an EEOC Charge and a complaint in this district court.  Id.

Plaintiff investigated a Disability, Age, National Origin, and Retaliation complaint that G.P. filed against the HDOT and individual Airport Division officials.  Pl.'s Opp'n 20. Plaintiff contends that the Airports Division personnel did not cooperate and that G.P. later filed a complaint with the EEOC and in state court.  Id.

**III. Plaintiff's Termination**

Beginning in April 2008, Plaintiff began to make complaints against her co-workers.  Plaintiff's complaints included allegations that she witnessed a "physical exchange" between two female co-workers that she considered inappropriate and "bordering on offensive"; co-workers read her e-mails; Taylor and Taylor's friends made fun of Plaintiff; Gorospe kept track of the time Plaintiff arrived at work; Gorospe altered her electronic calendar; Domingo attempted to prohibit her from attending an ADA training; Dau discriminated against her and harassed her when she applied for a close parking stall; Martin

10

improperly sent her home prior to the completion of an eight-hour

workday; Martin misquoted Plaintiff; and Taylor told other HDOT

employees that Plaintiff could not be trusted.  Defs.' Mot. Ex.

N, at 5-17.

The investigation of the complaints was assigned to

Domingo and Francis Keeno, the Deputy Director of Administration

for the HDOT.  Id.  On February 17, 2009, Domingo and Keeno held

a meeting with Plaintiff to discuss her complaints.  SAC ¶ 132.

Plaintiff declined to withdraw her complaints and try to work out

the issues with her co-workers on an informal basis, and thus the

HDOT conducted an investigation into them.  Domingo Dec. ¶ 16.

Because Plaintiff asserted many complaints, Domingo and Keeno

asked Plaintiff to provide a prioritized list of complaints, from

most important to least important.  Defs.' Mot. Ex. N, at 4.

Plaintiff asserts that "[s]uspicious of Keeno's motives, [she]

had great difficulty writing the mandatory list of complaints;

therefore, at [her] request, the deadline for submitting this

document was extended twice by Keeno."  SAC ¶ 132.  Plaintiff

eventually responded to the request for a prioritized list of

complaints with a nine-page letter dated March 20, 2009, and

entitled "Complaint Statement."  Id.

As a result of Plaintiff's complaints, four HDOT

employees filed counter-complaints against Plaintiff, alleging

that her complaints against them were patently false and that

such false complaints constituted harassment.  Defs.' Mot. Ex. N, at 3.  These four employees were Dau, Martin, a Civil Rights Specialist VI within the OCR, Manida Taylor, an OCR secretary, and Gorospe.  Id. at 5; see SAC ¶ 20.  Keeno and Domingo also considered the counter-complaints in their investigation. Domingo Declaration ¶¶ 19-21.  On March 4, 2009, the HDOT informed Plaintiff that it was placing her on Administrative Leave with pay, effective March 5, 2009, because the HDOT had determined that her continued presence in the office during the investigation would be disruptive and result in the possible loss of productivity and drop in employee morale.  Defs.' Mot. Ex. N, at 5.

The investigation report concluded that there was no merit to Plaintiff's complaints.  Id. at 17.  Specifically, Plaintiff failed to substantiate many of her complaints with any evidence and none of her complaints with credible evidence.  Id. The investigation report concluded that three of the four counter-complaints were meritorious and that Plaintiff knew or should have known that her complaints against Dau, Taylor, and Gorospe were clearly false and without merit.  Defs.' Mot. Ex. N, at 21.  The investigation report dismissed Martin's counter-complaint because the disagreement complained of was based on Plaintiff's opinion, unlike the other complaints based on facts, and thus did not need to be substantiated with evidence.  Id.

12

The report recommended that the HDOT terminate Plaintiff  based on the severity and egregiousness of the misconduct.  Id. at 23.  Specifically, the report stated the following considerations supported this recommendation: (1) Plaintiff abused the complaint process by submitting "absolutely no evidence to substantiate or corroborate her many complaints against her co-workers, and thus had turned the complaint process into "a form of legalized harassment"; (2) because Plaintiff, as an EEO Specialist, investigates complaints filed by others, she should have known better than to file complaints that are clearly false; (3) Plaintiff's credibility as an investigator has now been irreparably impugned; (4) Plaintiff's "acts of misconduct have had a tremendous negative impact on OCR," that she "has single-handedly brought morale down in OCR" and her misconduct has caused people to no longer want to work in OCR; (5) her misconduct has extended beyond OCR, involving BUS and CSS, HDOT's Highways Division, and other state employees outside of the HDOT; and (6) Plaintiff is a relatively new employee and this did not constitute a mitigating factor to mitigate against the recommendation for termination.  Id. at 23-24.

By letter dated August 18, 2009, the HDOT Director, Glenn Okimoto, notified Plaintiff that she was terminated for misconduct because she made false complaints against her co-workers.  Pl.'s Opp'n Ex. F.

13

## IV.  Plaintiff's EEOC Charges

After being placed on Administrative Leave, Plaintiff filed a discrimination charge on March 11, 2009, with the Equal Employment Opportunity Commission ("EEOC") and Hawaii Civil Rights Commission ("HCRC"), alleging disability discrimination and retaliation under the ADA and H.R.S. § 378-2, and retaliation for engaging in protected activity under Title II and H.R.S. § 378-2.  Plaintiff's March 11, 2009 EEOC charge only mentioned her request for flex time that was not granted until June 2008, a request for parking that was not granted until August 2008, a request in November 2008 for a printer on her desk, and questioning by Keeno in July 2008 about her using the restrooms on the 2nd and 3rd floors "in a confrontational manner."[6] Defs.' Mot. Ex. Q, at 1 & Ex. S, at 1-2.

On August 31, 2009, Plaintiff amended her EEOC charge to add her termination as another retaliation.[7]  Defs.' Mot. Ex. S.  She also added that she had been discriminated against for engaging in protected activity in violation of Title VII.  Defs.' Mot. Ex. S.  The EEOC dismissed her charges and issued Plaintiff a right to sue letter on May 17, 2010.  SAC ¶ 17.

---

[6]Plaintiff's original EEOC Charge stated that Keeno questioned her about her restroom use in December 2008, but her amended Charge, dated August 31, 2009, changed this date to July 2008.  See Defs.' Mot. Exs. Q & S.

[7]The Court will herein refer to this charge as her second EEOC charge.

**STANDARD**

I.   **Summary Judgment Standard**

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses. <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323–24 (1986).  Summary judgment is therefore appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion," and can do so in either of two ways: by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  <u>Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav.</u>

Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).[8/]  Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

     The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323; Miller v. Glenn Miller Prods., 454 F.3d 975, 987 (9th Cir. 2006).  The moving party may do so with affirmative evidence or by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.[9/]  Once the moving party satisfies its burden, the nonmoving party cannot

---

[8/]Disputes as to immaterial facts do "not preclude summary judgment."  Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986).

[9/]When the moving party would bear the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial.  See Miller, 454 F.3d at 987 (quoting C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000)).  When the nonmoving party would bear the burden of proof at trial, the party moving for summary judgment may satisfy its burden with respect to the motion for summary judgment by pointing out to the court an absence of evidence from the nonmoving party. See id. (citing Celotex, 477 U.S. at 325).

simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  See Celotex, 477 U.S. at 324; Matsushita Elec., 475 U.S. at 586; Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).[10] The nonmoving party must instead set forth "significant probative evidence" in support of its position.  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (quoting First Nat'l, 391 U.S. at 290).  Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial. See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the court must construe all evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.

---

[10]Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002); see also T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987); Johnson v. Wash. Metro. Area Transit Auth., 883 F.2d 125, 128 (D.C. Cir. 1989) ("The removal of a factual question from the jury is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury."), cited in Villiarimo, 281 F.3d at 1061.

See T.W. Elec. Serv., 809 F.2d at 630–31.[11/]  Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied.  Anderson, 477 U.S. at 250–51.

## II.  Special Considerations for a Pro Se Litigant

A pro se litigant's pleadings must be read more liberally than pleadings drafted by counsel.  Haines v. Kerner, 404 U.S. 519, 520-21 (1972); Wolfe v. Strankman, 392 F.3d 358, 362 (9th Cir. 2004).  When a plaintiff proceeds pro se and technically violates a rule, the court should act with leniency toward the pro se litigant.  Draper v. Coombs, 792 F.2d 915, 924 (9th Cir. 1986).  However, "a pro se litigant is not excused from knowing the most basic pleading requirements."  Am. Ass'n of Naturopathic Physicians v. Hayhurst, 227 F.3d 1104, 1107-08 (9th Cir. 2000).  Moreover, "[p]ro se litigants must follow the same rules of procedure that govern other litigants."  King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987).

## DISCUSSION

As a preliminary matter, Plaintiff asserts that the transcript of her deposition that Defendants submitted with their motion as exhibits D and E is an uncorrected and unsigned deposition which should not be given any weight.  Pl.'s Opp'n 25.

---

[11/]At the summary judgment stage, the court may not make credibility assessments or weigh conflicting evidence.  See Anderson, 477 U.S. at 249; Bator v. Hawaii, 39 F.3d 1021, 1026 (9th Cir. 1994).

She stated that she "made not less than 52 corrections to her deposition, and also discovered that many sentences and phrases were missing." Id. Defendants' counsel submitted an affidavit asserting that exhibits D and E are true and correct copies of Plaintiff's deposition. Defs.' Mot. Declaration of Maria C. Cook ¶¶ 7 & 8. With their reply, Defendants submitted a copy of a letter dated November 17, 2011, by Honolulu Reporting Services stating that Plaintiff had thirty days to come to their office and read, sign, and make any corrections to her deposition. Defs.' Reply Ex. OO. The letter stated that if Plaintiff did "not complete the signature page and corrections within this time your deposition will be filed with the Court without your signature." Id. Defendants' submitted another portion of Plaintiff's deposition with its reply and their attorney again filed a declaration stating that the excerpt submitted was true and correct copy. Defs.' Reply, Declaration of Maria C. Cook ¶ 5-6.

Plaintiff submitted no evidence to support her claim, such as the allegedly corrected copy of her deposition. Because a self-serving statement in her opposition cannot create a genuine issue of material fact for trial or constitute evidence, the Court will consider Plaintiff's deposition in its decision.[12]

---

[12] Plaintiff also asserts that the declarations by Domingo, Gorospe, Martin, and Dau contain "omissions, untruths, and inconsistencies," and that she "objects to the use and

See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (explaining that uncorroborated allegations and "self-serving testimony" do not create a genuine issue of material fact); Singh v. INS, 213 F.3d 1050, 1054 n.8 (9th Cir. 2000) (statements in motions are not evidence and are therefore not entitled to evidentiary weight); see also FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

The Court will address Plaintiff's Title VII claims, ADA claims, and Equal Protection claims in turn.  There is some overlap in the issues and the Court will refer back to its earlier factual findings and legal conclusions as necessary.

I.   **Title VII Claims**

A.   **Legal Framework**

Title VII makes it illegal for an employer to discharge or otherwise discriminate against an employee "because of such individual's race, color, religion, sex, or national origin."  42

---

admissibility of these false declarations as support for Defendants' assertions."  Pl.'s Opp'n 26.  Plaintiff submitted an exhibit listing all of the alleged false statements but did not provide any independent evidence of their falsity.  See Pl.'s Mot. Ex. P.  Plaintiff has given the Court no reason to doubt the veracity of these declarations, which were made under oath, beyond her conclusory, self-serving assertions.  Consequently, the Court will consider the declarations.

U.S.C. § 2000e-2(a).  It also makes it unlawful for an employer

to retaliate against an employee because she has opposed any

practice unlawful under Title VII.  <u>Id.</u> § 2000e-3.  Specifically,

42 U.S.C. § 2000e-3 provides:

> It shall be an unlawful employment practice
> for an employer to discriminate against any
> of his employees . . . because he has opposed
> any practice made an unlawful employment
> practice by this subchapter, or because he
> has made a charge, testified, assisted, or
> participated in any manner in an
> investigation, proceeding, or hearing under
> this subchapter.

Plaintiffs may utilize the burden shifting framework

set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 248

(1981), for retaliation claims.  <u>Cornwell v. Electra Cent. Credit</u>

<u>Union</u>, 439 F.3d 1018, 1035 (9th Cir. 2006) (citing <u>McDonnell</u>

<u>Douglas</u>, 411 U.S. at 802).  First, a plaintiff must establish a

prima facie case of retaliation by offering proof: (1) she

engaged in protected activity; (2) an adverse employment action

was taken against her; and (3) a causal link exists between the

protected activity and the adverse action.  <u>Hardage v. CBS</u>

<u>Broad., Inc.</u>, 427 F.3d 1177, 1188 (9th Cir. 2005).

Once an individual establishes a prima facie case of

retaliation, "the burden shifts to [the employer] to articulate a

legitimate, non-discriminatory reason for the adverse employment

action." <u>Stegall v. Citadel Broad. Co.</u>, 350 F.3d 1061, 1066 (9th

Cir. 2003).  If the employer articulates such a reason, the

employee "bears the ultimate burden of demonstrating that the
reason was merely a pretext for a discriminatory motive."   Id.

### B.   Protected Activity

Plaintiff asserts that she engaged in statutorily
protected activity by carrying out the duties of her position –
specifically, "assisting and/or supporting HDOT's employees who
filed or considered filing complaints alleging discrimination,
harassment, and/or retaliation," investigating such complaints,
"refusing to change her report recommendations when pressured to
do so," and filing her EEOC Charge in March 2009.   SAC ¶ 154.
She additionally asserts that she engaged in protected activity
"when she voiced a complaint regarding her own ADA accommodation
requests being denied or delayed."   Pl.'s Opp'n 36.

Defendants assert that because Plaintiff handled
complaints of discrimination as part of her job duties, she was
not engaging in protected activities.   Defs.' Mot. Mem. 15.
Defendants further assert that Plaintiff has not shown that she
had a reasonable belief that her employer had engaged in an
unlawful employment practice because she never alleged that the
HDOT was engaging in discriminatory treatment towards any of its
employees during her investigations.   Id. at 17.   Defendants
contend that Plaintiff's complaint regarding her own ADA
disability accommodation requests is not a protected activity
under Title VII, and thus cannot support a Title VII retaliation

claim.  Defs.' Reply 3.

        With regard to protected activity, § 2000e-3 contains

both an "opposition clause" and "participation clause."  <u>Learned</u>

<u>v. City of Bellevue</u>, 860 F.2d 928, 932 (9th Cir. 1988).

Plaintiff has failed to state a claim under either clause.

        **1.    Opposition Clause**

        The opposition clause makes it "unlawful . . . for an

employer to discriminate against any . . . employe[e] . . .

because he has opposed any practice made . . . unlawful . . . by

this subchapter."  42 U.S.C. § 2000e-3(a).  Plaintiff's asserted

protected activities do not fall within the opposition clause.[13/]

Plaintiff's mere participation in and investigation of employee

complaints, as part of her job, is not a protected activity.

        The Ninth Circuit has explained:

        [A]n employee does not receive special
        protection under Title VII simply because the
        employee handles discrimination complaints or

_____

        [13/]Plaintiff appears to misunderstand the "opposition
clause."  In her opposition, Plaintiff states that managers and
administrators had "oppositional responses" to her findings and
recommendations, "often in a passive-aggressive form."  Pl.'s
Opp'n 6.  To qualify as a protected activity pursuant to the
"opposition clause", however, <u>Plaintiff</u> must have opposed conduct
by the HDOT, or a supervisor acting on its behalf, that is
unlawful under Title VII.  Plaintiff's disagreement with how the
managers and supervisors handled internal employment complaints
and investigations does not demonstrate that she engaged in a
protected activity through opposing conduct unlawful under Title
VII by the HDOT.  In fact, Plaintiff stated that "having no
authority to direct or order compliance, [she] had to accept
these situations and, in essence, remain quietly ineffective."
<u>Id.</u>

> works on affirmative action matters. . . . 42
> U.S.C. § 2000e-3(a) does not prevent an
> employer from dismissing an employee who
> handles discrimination complaints as part of
> his job when the employee handles these
> complaints contrary to the instructions of
> his employer.

Nelson v. Pima Cmty. Coll., 83 F.3d 1075, 1082 (9th Cir. 1996)

(omission in original) (internal quotations omitted).

In Smith v. Singer Co., 650 F.2d 214 (9th Cir. 1981),

Smith asserted that his former employer, Singer Company,

terminated him in retaliation for having engaged in protected

activities in violation of § 2000e-3.  Smith's job required him,

inter alia, to "develop affirmative action programs" and "serve

as liaison between the [company] and the enforcement agencies and

between the [company] and minority, women's and community action

groups." Id. at 215.  Smith asserted that his discharge was

retaliatory because "he encountered lack of cooperation and

commitment from the company in his efforts to accomplish needed

reforms in the affirmative action program, and that reports to

management in this effect were ignored."  Id.

The Ninth Circuit explained that the question Smith

raised "is whether, under [§] 2000e-3(a), it is protected

activity for this executive employee, occupying this position of

responsibility, to take such action against the company he

represents in support not of his own rights but of the perceived

rights of those with whom it is his duty to deal on behalf of his

24

company." Id. at 217.  The Ninth Circuit answered no, and

explained: "If [§] 2000e-3(a) gives him the right to make himself

an adversary of the company, then so long as he does not give

nonprivileged cause for dismissal he is forever immune from

discharge.  Section 2000e-3(a) so construed renders wholly

unworkable the program of voluntary compliance which appellant

was employed to conduct." Id.  Here, it is undisputed that

Plaintiff engaged in intake and investigation of the subject

employee complaints as part of her job.  Plaintiff has not

asserted that she acted beyond the scope of her job duties in any

of her investigations.  As in Smith, Plaintiff did not engage in

protected activity through the mere performance of her job.

     There is nothing in the record to suggest that through

Plaintiff's investigations, she was opposing any employment

action of the HDOT rendered unlawful by Title VII, i.e.,

discrimination against an individual "because of such

individual's race, color, religion, sex, or national origin."

See 42 U.S.C. § 2000e-2.  The Ninth Circuit has explained that

"opposition clause protection will be accorded whenever the

opposition is based on a reasonable belief that the employer has

engaged in an unlawful employment practice." Freitag v. Ayers,

468 F.3d 528, 541 (9th Cir. 2006) (internal quotations omitted);

see Trent v. Valley Elec. Ass'n Inc., 41 F.3d 524, 526 (9th Cir.

1994) (explaining that to establish protected activity, the

plaintiff must "show that she had a 'reasonable belief' that the employment practice she protested was prohibited under Title VII").

Plaintiff stated in her deposition that it was not her job to advocate for any employee; rather, it was to monitor and make sure that the HDOT was in compliance with federal laws. Pl.'s Dep. 53:20-24.  Four of the Title VII investigations Plaintiff relies on did not result in a finding of unlawful discrimination under Title VII.  She made no findings regarding the J.S. complaint about financial fraud, which was based on whistle-blowing related to financial fraud and workplace violence, statuses not protected under Title VII, because it had been withdrawn; she made no findings regarding the C.D. case because the investigation was conducted by C.D.'s supervisor; she concluded there was no discrimination based on marital status or gender in M.Y.'s case; and the H.H. case resulted in a settlement agreement without a specific finding of sexual harassment.

The one investigation Plaintiff found discrimination had occurred involved a complaint for sexual harassment filed by R.S. against a co-employee, J.R.  Plaintiff stated that her investigation revealed that J.R. had sexually harassed, bullied, and engaged in workplace violence.  Pl.'s Opp'n 21.  Plaintiff's report recommended that R.S. and J.R. should not be assigned to the same work location.  Pl.'s Opp'n Ex. N, at 7.  Plaintiff

26

stated that "Martin was later very critical of [Plaintiff's]
findings and stated this to her directly."  Pl.'s Opp'n 21.
These facts are insufficient to establish Plaintiff engaged in
protected activity; her investigation involved two co-employees
and her assertions and evidence do not suggest that she opposed
an action of the HDOT or any supervisor that is unlawful under
Title VII through this investigation.  See Silver v. KCA, Inc.,
586 F.2d 138, 141 (9th Cir. 1978) (holding that where employee is
terminated for confronting a co-worker about a racial comment,
employer does not violate Title VII because employee did not
oppose an employment practice of the employer).

     Consequently, Plaintiff did not engage in protected
activity through her investigations of employee complaints.

     **2.   Participation Clause**

     Plaintiff asserts that she "engaged in protected
activities when she voiced a complaint regarding her own ADA
accommodation requests being denied or delayed."  Pl.'s Opp'n 36.
She also asserts she engaged in protected activity in filing her
EEOC charge.

     The purpose of the participation clause "is to protect
the employee who utilizes the tools provided by Congress to
protect his rights."  Vasconcelos v. Mease, 907 F.2d 111, 113
(9th Cir. 1990).  "[T]he statutory language specifically limits
the participation clause of section 2000e-3 to proceedings 'under

27

this subchapter.'" Id. (quoting 42 U.S.C. § 2000e-3).  Internal investigations are not within the ambit of the participation clause, see id. at 113, and there is no evidence Plaintiff participated in any EEOC proceedings on behalf of other employees.[14]

Plaintiff's March 2009 EEOC charge, both as originally filed and as amended, does not fall within the protection of § 2000e-3 because she alleged discrimination based solely on her disability.  This charge asserted she was discriminated against by being denied reasonable accommodations and being questioned in a confrontational manner as to why she used restrooms on the 2nd and 3rd floors; the charge contained no allegations that could be reasonably construed as discrimination prohibited by Title VII. See Defs.' Mot. Ex. Q; Learned 860 F.2d at 932 (explaining that the mere fact that an employee is participating in a proceeding

_____

[14]The Court notes that Plaintiff had a tenuous involvement in H.H.'s EEOC charge because H.H. used a statement that Plaintiff typed as her EEOC charge.  Plaintiff, however, was not acting on behalf of H.H. when she typed the statement as she did so for internal office purposes.  Although Plaintiff allowed H.H. to take a copy, there was no EEOC proceeding pending at that time and Plaintiff was "shocked" when H.H. used this form as her EEOC Charge.  Defs.' Mot. Ex. D, at 14-17.  Thus, Plaintiff did not act in the EEOC proceeding on behalf of H.H.  Plaintiff also asserts that J.K. called her as a witness in her EEOC proceeding. Pl.'s Opp'n 30.  Plaintiff, however, stated in her deposition that J.K. filed her EEOC discrimination charge based on a medical disability and after Plaintiff was terminated.  Pl.'s Deposition 58:23-59:10.  Thus, J.K.'s EEOC charge was not based on a status protected under Title VII, and in any event, could not have been related to Plaintiff's earlier termination.

28

involving discrimination charges does not automatically trigger the protection of § 2000e-3; rather, "the underlying discrimination must be reasonably perceived as discrimination prohibited by Title VII"); see also Ka'Anoi v. Dail, Civ. No. S-07-2722 JKS-EFB-PS, 2009 WL 3487083, at *6 n.5 (E.D. Cal. Oct. 23, 2009) ("Disability is not a protected class under Title VII.").

Plaintiff's second EEOC charge, filed on August 31, 2009, states that she was discriminated against, inter alia, for engaging in protected activity in violation of Title VII.  Thus, this is sufficient to establish a protected activity under the participation clause of § 2000e-3.  Plaintiff, however, cannot establish a causal connection between this protected activity and an adverse employment action.

C.   **Adverse Employment Actions**

In establishing an anti-retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotations omitted).  The Supreme Court has explained that it requires "material adversity because we believe it is important to separate significant from trivial harms." Id.  Particularly,

29

"Title VII . . . does not set forth a general civility code for the American workplace." Id. (internal quotations omitted). Thus the anti-retaliation provision prohibits employer actions that, objectively, "are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." Id. (internal quotations omitted).

Plaintiff states that she suffered the following adverse employment actions: (1) Domingo and others took investigations away from her; (2) she was confronted by the HDOT administrators and officials and chastised when she assisted complainants; (3) she was prevented from implementing proper interventions or stating findings that verified complainants' allegations; (4) she was placed on administrative leave without justification; and (5) she was terminated.  Pl.'s Opp'n 36.

In these circumstances, the removal of a few investigations, being "chastised" a few times by administrators, and being prevented from implementing interventions or stating findings in a handful of cases are not the type of "materially adverse" actions that would objectively deter someone from filing an employment discrimination complaint.  Instead, these actions fall under the ambit of "petty slights or minor annoyances that often take place at work and that all employees experience" and are not actionable retaliatory conduct.  White, 548 U.S. at 68; see Stewart v. Miss. Transp. Comm'n, 586 F.3d 321, 332 (5th Cir.

30

2009) (concluding the taking of personal items from employee's
desk, changing the locks on employee's office door to where she
could not close it, and superiors chastising and co-workers
ostracizing employee did not constitute materially adverse
employment actions).

Defendants do not dispute that Plaintiff's termination
was an adverse employment action. Defs.' Mot. Mem. 23-24. The
Ninth Circuit has stated that "being placed on administrative
leave might qualify as an adverse employment action and we have
suggested an investigation of an employee might so qualify."
Lakeside-Scott v. Multnomah Cnty., 556 F.3d 797, 803 (9th Cir.
2009). The Court will assume for sake of argument that
Plaintiff's placement on administrative leave qualifies as a
materially adverse employment action because she nonetheless
cannot establish the causation element.

**D. Causal Connection**

Defendants assert Plaintiff has failed to show a causal
connection between Plaintiff's EEOC charge and her termination.
Defs.' Mot. Mem. 24. Defendants assert that because Plaintiff
was already under investigation for counter-complaints filed by
her co-workers when she filed her EEOC Charge on March 11, 2009,
she cannot argue that the filing of the charge was the reason for
her termination. Id. at 24-25. The Court agrees.

Plaintiff filed her second EEOC charge on August 31,

31

2009.  The HDOT, however, sent Plaintiff a letter dated August 18, 2009, stating that her employment is terminated effective September 9, 2009.  Defs.' Mot. Ex. W.  Consequently, Defendants could not have terminated Defendant in retaliation to the EEOC charge filed after Defendant notified Plaintiff of her termination.  <u>See</u> <u>Silver</u>, 586 F.2d at 143 ("Obviously, if a charge is not filed with the EEOC until after the discharge, the latter cannot be motivated by a desire to retaliate for the former.").

**E.   Legitimate and Nondiscriminatory Reasons for Termination**

Defendants assert that assuming <u>arguendo</u>, that Plaintiff could establish a prima facie case of retaliation, Plaintiff was terminated for a legitimate nondiscriminatory reason, <u>i.e.</u>, misconduct.  Defendants' evidence establishes that it terminated Plaintiff because (1) she abused the complaint process; (2) she should have known better than to file knowingly false complaints due to her position as an EEO Specialist who investigates employee complaints; (3) Plaintiff's credibility as an investigator had been irreparably impugned; (4) Plaintiff's act of misconduct have had a tremendous negative impact on her co-workers; (5) Plaintiff's acts of misconduct extended beyond her division and involved other divisions within the HDOT and outside of the HDOT; and (6) Plaintiff's employment was

32

relatively short.   Defs.' Mot. Ex. N, at 23-24.

It is undisputed that four of Plaintiff's co-workers
filed counter-complaints against her.   The investigation into
Plaintiff's complaints and the counter-complaints against her was
extensive and resulted in an investigation report that contained
over 200 pages.   See Defs.' Mot. Ex. N, at 2.   Dau explained that
Plaintiff's accusations had "negatively impacted [her]
Department" and caused "disruption . . . for me, my productivity
in my office and with others."   Defs.' Mot. Ex. N., at 28.
Martin stated that Plaintiff "is causing a disruption to
operations and is negatively impacting office morale."   Id. at
30.   Taylor stated that Plaintiff was "attacking my principles
and morals and it's very upsetting," and that the situation
"stresses me out."   Id. at 35.   Finally, Gorospe states that due
to the situation with Plaintiff, "it has been a very stressful
time for most of the OCR staff."   Id. at 39.   He further stated
that he feels that he felt apprehensive in the office when making
phone calls because he "can't help but feel like [Plaintiff] will
take something I said, and turn it around and make another claim
against me."   Id.

At this stage, the "burden is one of production, not
persuasion; it 'can involve no credibility assessment.'"   Reeves
v. Sanderson Plumbing Prods., 530 U.S. 133, 142 (2000) (quoting
St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).

33

Defendants have met this burden through providing admissible evidence sufficient for the trier of fact to conclude that Plaintiff was terminated for knowingly filing false complaints against her co-workers and the resulting negative impact on other HDOT employees.  See <u>Wortham v. Integrated Health Servs.</u>, 302 F. Supp. 2d 854. 858-59 (N.D. Ohio 2004) (legitimate nondiscriminatory reasons for not promoting plaintiff include that plaintiff was not a team player and was not a leader); <u>Allen v. Cornish & Carey</u>, No. 96-20254 SW, 1997 WL 195433, at *3  (N.D. Cal. Apr. 11, 1997) ("Defendant has satisfied its burden of showing a legitimate, nondiscriminatory reason for terminating Plaintiff.  Defendant had received numerous complaints from sales agents concerning the plaintiff's performance as a manager. . . . Defendant introduced evidence that managers expressed other sources of dissatisfaction and low morale, such as Plaintiff's failure to actively run the office, his failure to attend certain meetings, and his expressing crude remarks to some people in the office.").

Thus, the burden shifts back to Plaintiff to show that this articulated reason is a pretext for discrimination.  See <u>McDonnell Douglas</u>, 411 U.S. at 804.

**F.   Pretext**

Plaintiff has the ultimate burden of persuasion; Plaintiff must show "both that the reason was false, and that [retaliation] was the real reason."  <u>St. Mary's Honor Ctr.</u>, 509

34

U.S. at 516–17.  In other words, "plaintiff must show that the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1062 (9th Cir. 2002) (quoting <u>Chuang v. Univ. of Cal. Davis</u>, 225 F.3d 1115, 1123 (9th Cir. 2000)).  "Although a plaintiff may rely on circumstantial evidence to show pretext, such evidence must be both specific and substantial."  <u>Id.</u>

Defendants assert that Plaintiff has failed to rebut their legitimate non-discriminatory reason for Plaintiff's termination, <u>i.e.</u>, her misconduct, with specific facts.  Defs.' Reply 10.  Plaintiff asserts that Defendants' reason was pretextual.  Pl.'s Opp'n 36-37.  She states that her performance evaluations stated she met expectations with no negative comments, that Domingo never reprimanded her, and "[m]ost important, she never intentionally made false complaints, the pretext reason for her employment termination."[15/]  <u>Id.</u>

_____

[15/]Plaintiff also relies on the fact that a state agency in her claim for unemployment insurance ("UI") benefits found that she was not guilty of misconduct.  Pl.'s Opp'n 37.  Plaintiff submitted a decision by the UI division that stated her "employer has not provided sufficient evidence that there was any willful misconduct on your part."  Pl.'s Opp'n Ex. T.  Defendants assert that a decision by a hearing officer granting Plaintiff UI benefits is not binding or relevant in a discrimination case based on federal statutes.  Defs.' Reply 9.  They assert that in

Plaintiff has produced no direct evidence that she was terminated for discriminatory reasons.  She has also failed to produce any circumstantial evidence to suggest that the HDOT's "proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable."  See Lyons v. England, 307 F.3d 1092, 1113 (9th Cir. 2002) (internal quotations omitted).  Instead, Plaintiff makes the general and conclusory assertions that she "has never engaged in 'misconduct' . . . nor did [she] disrupt the business operations of any office within HDOT, or interfere with any HDOT employee's ability to perform his or her work."  Pl.'s Opp'n 5.  She asserts that the "only causal link to the adverse employment action that she engaged in protected activity, on her own behalf, and by assisting employee-complainants and investigating their complaints of unlawful discrimination."  Id. at 37.  These general and conclusory assertions, however, are insufficient to

---

any event, Plaintiff entered into an agreement with the HDOT that in exchange for the HDOT withdrawing its appeal of the UI decision, the findings and conclusions in the decision would be limited to the UI claim and process, and would not be used against the HDOT in any other proceedings or lawsuit.  Id. at 9-10.  Defendants submitted a copy of the agreement so stating with their reply.  Id. Ex. MM.  The Court agrees with the Defendants, the standards for state UI benefits is different than that in a federal employment discrimination case.  The Court affords no weight to the UI decision.  In any event, even if Plaintiff did not engage in misconduct, she still bears the burden to establish that the HDOT terminated her for retaliatory reasons.  See St. Mary's Honor Ctr., 509 U.S. at 519.

raise an inference of discrimination.  See Lyons, 307 F.2d at 1113 ("Circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment.") (internal quotations omitted).

## II.  ADA Claims

### A.   The Parties' Arguments

Plaintiff asserts that the HDOT "through its agents and employees discriminated against [her] based upon her disability by denying or unreasonably delaying the providing of reasonable accommodations of parking in closer proximity, a flexible schedule for traveling to ADA fitted restrooms, a flexible arrival time due to her serious injuries and need to use the City Hand-Van, extended time to complete work, and denying her permission to install a personally-purchased printer that she requested upon her return to work in January 2008 or shortly thereafter."  SAC ¶ 159.  She further states that she was subject to "numerous adverse actions based upon her status as a disabled person requesting ADA Reasonable Accommodations."  Id. ¶ 160.

Defendants have not asserted that Plaintiff is not disabled within the meaning of the ADA.  Rather, Defendants assert that summary judgment is proper on Plaintiff's ADA claims because Defendants are entitled to sovereign immunity. Specifically, Defendants assert that the HDOT, as a state agency, is entitled to sovereign immunity, and that Okimoto is entitled

to sovereign immunity because the <u>Ex Parte Young</u> doctrine, a limited exception to sovereign immunity, does not apply here. Defs.' Mot. Mem. 27-29.  Defendants further assert that, in any event, Plaintiff cannot show she was discriminated and retaliated against based on her disability.  <u>Id.</u> at 34.

## B. The HDOT's Immunity from Suit under the ADA

Eleventh Amendment Immunity applies to claims brought against a state in federal court unless the state unequivocally consents or Congress unequivocally abrogates the immunity under its Fourteenth Amendment authority.  <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 99 (1984).  The Eleventh Amendment prohibits suits against state agencies such as the HDOT "regardless of the nature of the relief sought."[16]  <u>Id.</u> at 100.

"A state may waive its Eleventh Amendment immunity only by giving an 'unequivocal indication' that it consents to suit in a federal court."  <u>Charley's Taxi Radio Dispatch v. SIDA of Hawaii, Inc.</u>, 810 F.2d 869, 873 (9th Cir. 1987); <u>see also</u> <u>Pennhurst</u>, 465 U.S. at 99. "[I]n the absence of consent, a suit

_____

[16]The Eleventh Amendment, U.S. Const. amend XI., provides: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  Although "[t]his language expressly encompasses only suits brought against a State by citizens of another State, . . . [the Supreme] Court long ago held that the Amendment bars suits against a State by citizens of that same State as well."  <u>Papasan v. Allain</u>, 478 U.S. 265, 276 (1986) (citing <u>Hans v. Louisiana</u>, 134 U.S. 1 (1890)).

in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." Pennhurst, 465 U.S. at 101.  The HDOT, a state agency, has asserted its immunity from this suit in its Answer to the Second Amended Complaint and its Motion for Summary Judgment and thus the State has not given an unequivocal indication of consent to this suit.  See Doc. No. 62, Defendants' Answer to Second Amended Complaint, Fifth Defense; Defs.' Mot. Mem. 27-31.

Congress may abrogate a state's sovereign immunity if it has "unequivocally expresse[d] its intent to abrogate the immunity," and "has acted pursuant to a valid exercise of power." Seminole Tribe of Florida v. Florida, 517 U.S. 44, 55 (1996) (alteration in original) (internal quotations omitted).  To express its intent to abrogate the immunity, Congress must make "its intention unmistakably clear in the language of the statute."  Id. at 56 (internal quotation omitted).  To constitute a valid abrogation of immunity, Congress must act pursuant to an exercise of its constitutional authority.  See Bd. of Trs. of the Univ. of Alabama v. Garrett, 531 U.S. 356, 364 (2001).

Plaintiff asserts that Congress abrogated the State's immunity through 42 U.S.C. § 12202, which provides:

> A State shall not be immune under the
> eleventh amendment to the Constitution of the
> United States from an action in [a] Federal
> or State court of competent jurisdiction for
> a violation of th[e] [ADA].  In any action
> against a State for a violation of the

39

> requirements of this chapter, remedies
> (including remedies both at law and in
> equity) are available for such a violation to
> the same extent as such remedies are
> available for such a violation in an action
> against any public or private entity other
> than a State.

Defendants argue that Plaintiff's reliance on § 12202 is misplaced as the Supreme Court has invalidated it as applied against the State.  Defs.' Reply 10-11.

The Court agrees with Defendants with respect to Title I of the ADA – the claim as against the HDOT is barred on sovereign immunity.  To the extent Plaintiff is asserting a claim based on Title II of the ADA against the HDOT, although such claim is not barred by sovereign immunity, it fails on the merits.

### 1.  Title I of the ADA

Title I of the ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112.

In Board of Trustees of the <u>University of Alabama v. Garrett</u>, the Supreme Court held that in enacting 42 U.S.C. § 12202, Congress did not validly abrogate the States' sovereign immunity from suit by private individuals for money damages under

40

Title I of the ADA.  531 U.S. at 374.  The Court noted that the standards of Title I "can be enforced . . . by private individuals in actions for injunctive relief under Ex Parte Young."  See id. at 374 n. 9; see also Ex Parte Young, 209 U.S. 123 (1908).  The Court, however, did not leave open the recourse of injunctive relief against a state, as opposed to an individual in his official capacity for prospective injunctive relief, under Title I.  See Savage v. Glendale Union High Sch., 343 F.3d 1036, 1040 (9th Cir. 2003) (citing Garrett for the proposition that "Congress may not abrogate the sovereign immunity of the states for suits under Title I of the ADA," and therefore plaintiff may not sue an arm of the state in federal court for injunctive or monetary relief under Title I).

Consequently, Plaintiff's claims under Title I against the HDOT are barred by sovereign immunity.  See Lightsy v. Hawaii, Civ. No. 05-00515 ACK-LEK, 2006 WL 314335, at *4 (D. Haw. Feb. 7, 2006) (Dismissing Title I of the ADA claim against the State of Hawaii for injunctive relief and money damages because of Eleventh Amendment Immunity).

## 2. Title II of the ADA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be

41

subjected to discrimination by such entity." 42 U.S.C. § 12132.

Neither Plaintiff's Complaint nor her opposition specifies

whether her ADA claims are made pursuant to Title I, Title II, or

both of these titles.[17/]

Assuming that Plaintiff does assert a violation of

Title II of the ADA, the Ninth Circuit has found that Congress

validly abrogated the states' Eleventh Amendment sovereign

immunity under that title. See Phiffer v. Columbia River

Correctional Inst., 384 F.3d 791, 792-93 (9th Cir. 2004); see

also United States v. Georgia, 546 U.S. 151, 159 (2006)

(concluding that Title II validly abrogates state sovereign

immunity for conduct that actually violates the Fourteenth

Amendment, but declining to reach the issue of whether Title II

validly abrogates state sovereign immunity for conduct that does

not violate the Fourteenth Amendment). Thus, Plaintiff's

potential Title II claim against the HDOT is not barred by

sovereign immunity.

Plaintiff's Title II claim against the HDOT nonetheless

fails because the Ninth Circuit has held that "Title II does not

apply to employment." Zimmerman v. Or. Dep't of Justice, 170

F.3d 1169, 1184 (9th Cir. 1999) (recognizing an inter-circuit

---

[17/]The Complaint refers only to the "Americans with
Disabilities Act, as Amended," and does not cite to any
particular provision thereof. Plaintiff's opposition only
mentions § 12202 for the proposition that Congress waived the
State's sovereign immunity under the ADA. See Pl.'s Opp'n 38.

split of authority but finding that Title II of the ADA does not

apply to employment).  The allegations contained in the Complaint

relate solely to Plaintiff's employment as opposed to the "public

services" that are covered under Title II.  Id. at 1172-74.

Accordingly, any potential Title II claim is without merit.

C.    **ADA Claims Against Okimoto in His Official Capacity**

Defendants assert that Plaintiff's only potentially

viable claim under the ADA is for prospective injunctive relief

against Okimoto, but that this claim is barred by the Eleventh

Amendment because Plaintiff has not alleged an ongoing present

violation of federal law and there is no appropriate prospective

relief.  Defs.' Mot. Mem. 29.  The Court agrees that Plaintiff

cannot recover damages for her retaliation claim because these

claims do not fall within the narrow exception to sovereign

immunity set forth in Ex Parte Young.  Moreover, the Ninth

Circuit has held that compensatory damages are not available for

retaliation claims under the ADA.  See Alvarado v. Cajun

Operating Co., 588 F.3d 1261, 1268 (9th Cir. 2009) (holding

compensatory and punitive damages are not available for ADA

retaliation claims).

Sovereign immunity, however, does not bar Plaintiff's

ADA claim against Okimoto to the extent that she seeks the

prospective relief of reinstatement to her position,

reinstatement of eligibility for employment benefits, and

43

expungement of certain statements from her personnel file.
Nonetheless Okimoto is entitled to summary judgment on
Plaintiff's ADA claim because it fails on the merits.

### 1. Okimoto's Sovereign Immunity

Pursuant to the doctrine set forth by the Supreme Court
in Ex Parte Young, 209 U.S. 123 (1908), the Eleventh Amendment
does not prohibit suits for prospective declaratory and
injunctive relief against state officials, sued in their official
capacities, to enjoin an alleged ongoing violation of federal
law.  See Agua Caliente Band of Cahuilla Indians v. Hardin, 223
F.3d 1041, 1045 (9th Cir. 2000).

Seeking injunctive relief is not necessarily enough to
avoid dismissal for Eleventh Amendment immunity.  See Han v. U.S.
Dep't of Justice, 45 F.3d 333, 338 (9th Cir. 1995).  "'Relief
that in essence serves to compensate a party injured in the past
by an action of a state official in his official capacity that
was illegal under federal law is barred . . . even though styled
as something else.'"  Id. (omission in original) (quoting
Papasan, 478 U.S. at 278).  "In determining whether the doctrine
of Ex Parte Young avoids an Eleventh Amendment bar, a court need
only conduct a 'straightforward inquiry into whether [the]
complaint alleges an ongoing violation of federal law and seeks
relief properly characterized as prospective.'"  Miranda B. v.
Kitzhaber, 328 F.3d 1181, 1189 (9th Cir. 2003) (alteration in

original) (quoting <u>Verizon Md., Inc. v. Pub. Serv. Comm'n of</u> <u>Maryland</u>, 535 U.S. 635, 645 (2002)).  A plaintiff may not seek a "retroactive award which requires the payment of funds from the state treasury." <u>Foulks v. Ohio Dep't of Rehabilitation and</u> <u>Correction</u>, 713 F.2d 1229, 1323 (6th Cir. 1983) (citing <u>Edelman</u> <u>v. Jordan</u>, 415 U.S. 651 (1974)).

Plaintiff alleges that Defendants discriminated against her by "denying or unreasonably delaying the providing of reasonable accommodations of parking in closer proximity, a flexible schedule for traveling to ADA fitted restrooms, a flexible arrival time . . ., extended time to complete work, and denying her permission to install a personally-purchased printer." SAC ¶ 159.  Plaintiff is no longer employed by the HDOT.  Consequently, to the extent Plaintiff seeks a declaration that the asserted failure to provide, or delay in providing, reasonable accommodations violated the ADA, this claim is based on past actions and therefore barred by sovereign immunity.  <u>See</u> <u>Lightsy</u>, 2006 WL 314335, at *6 ("A straightforward inquiry reveals that Plaintiff's claim for declaratory relief seeks a declaration that a past action (a previous refusal to extend Plaintiff's 'light duty' assignment) violated Title I of the ADA. To the extent that Plaintiff seeks a declaration against Governor Lingle and Mr. Lopez that their past actions violated Title I, that claim is barred by the Eleventh Amendment.") (internal

45

citation omitted); see also Papasan, 478 U.S. at 277-78 ("Young has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past. . . .").

Plaintiff also asserts that her "requests for ADA Reasonable Accommodations were purposely denied or delayed to retaliate against her and marginalize her in her work which would force her to resign." See SAC ¶ 54.  Plaintiff contends that Defendants subjected her to "numerous adverse actions based upon her status as a disabled person requesting ADA Reasonable Accommodations, including, but not limited to, being placed under investigation, having her duties removed, being placed on Administrative Leave, and wrongfully discharged from employment." Id. ¶ 160.  Based on these allegations, Plaintiff seeks a request for reinstatement, restoration of retirement and medical benefits eligibility, and expungement of statements from her personnel file.  Id. Prayer for Relief ¶ 5.

These assertions survive the continuing violation requirement; if Plaintiff could establish that her termination was in violation of a federal right, her injury in the form of unlawful deprivation from employment would represent an ongoing violation.  See Doe v. Lawrence Livermore Nat'l Lab., 131 F.3d 836, 842 (9th Cir. 1997) (holding that job reinstatement is

prospective injunctive relief to end an ongoing violation of federal law).  Plaintiff's requests for reinstatement, restoration of benefits eligibility, and expungement, are sufficient prospective relief for purposes of Ex Parte Young. See Hibbs v. Dep't of Human Res.,  273 F.3d 844, 871 (9th Cir. 2001) ("[R]einstatement is the sort of prospective injunctive relief for which a state officer can be held liable."); Holm v. Wash. State Penitentiary, 19 Fed. App'x 704, 705 (9th Cir. 2001) (recognizing Ex Parte Young would not bar "injunctive relief, such as expungement or revision of employment records or reinstatement," as against individual defendants).[18]

The Court will thus consider Plaintiff's ADA retaliation claim on the merits in so far as she seeks prospective injunctive relief as against Okimoto for her termination.

## 2. Plaintiff's ADA Retaliation Claim Against Okimoto

### a.   Legal Framework

The anti-retaliation provision of the ADA, 42 U.S.C. § 12203(a) provides:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by

---

[18]The Court notes that to the extent Plaintiff seeks back pay and benefits, she is seeking retrospective relief which is not within the Ex Parte Young exception to sovereign immunity. See Thorn v. State, Dep't of Taxation, No. 98-15734, 1999 WL 170784, at *1 (9th Cir. Mar. 23, 1999).

> this chapter or because such individual made
> a charge, testified, assisted, or
> participated in any manner in an
> investigation, proceeding, or hearing under
> this chapter.

To establish a prima facie case of ADA retaliation, a plaintiff

must show: "(1) involvement in a protected activity, (2) an

adverse employment action and (3) a causal link between the two."

Alvarado v. Cajun Operating Co., 588 F.3d 1261, 1269 (9th Cir.

2009) (internal quotation omitted).  If Plaintiff is able to

assert a prima facie retaliation claim, the McDonnell Douglas

burden shifting scheme discussed supra applies.  Steggal v.

Citadel Broad. Co., 350 F.3d 1061, 1066 (9th Cir. 2003).

### b.   The Parties' Arguments

Plaintiff asserts that she was retaliated against based

on her involvement in J.K.'s employee complaint, for requesting

reasonable accommodations, and for filing her EEOC charges.

Defendants assert that Plaintiff never alleged that she was

terminated because of her disability until her opposition.

Defs.' Mot. Mem. 12.  Plaintiff, however, made this allegation in

her complaint, and the Court will thus consider it.  SAC ¶ 160

("HDOT . . . subjected [Plaintiff] to . . . numerous adverse

actions based upon her status as a disabled person requesting ADA

Reasonable Accommodations, including . . . being placed on

Administrative Leave[] and wrongfully discharged from

employment.").

48

Defendants assert that Plaintiff cannot show she was terminated because of her disability or because she engaged in protected activity recognized under the ADA.  Defs.' Reply 12. Defendants assert that even if Plaintiff could make out a prima facie case of retaliation, Defendants have proffered a legitimate non-discriminatory reason for Plaintiff's termination that Plaintiff has failed to show was pretextual.  Id. at 13.

### c.   Protected Activities

The Court first notes that Plaintiff's involvement in the employee complaints by J.K. and G.P. are not protected activities.  As with the Title VII claims, Plaintiff was performing her job duties.  Plaintiff had limited involvement in J.K.'s complaint.  J.K. gave Plaintiff a written list of allegations against Dau; Plaintiff, however, never even opened a file for J.K.  Pl.'s Dep. 57:16-24, 59:11-20.  Plaintiff denied advocating for J.K. and "[t]he case was taken away from [her] and Melanie [Martin] started an investigation of [J.K.'s] allegations."  Id. 60:17-24 (emphasis added).  Thus Plaintiff made no findings and did not oppose any action by the HDOT with regard to J.K.'s complaint.  Plaintiff provided no details about her involvement in G.P.'s claim beyond that she investigated the complaint and the Airport Division personnel did not cooperate with her.  Consequently, the G.P. complaint cannot support that Plaintiff engaged in any protected activity.

49

Plaintiff's request for reasonable accommodations and
her EEOC charge for disability discrimination, however, are
protected activities.  See Connor v. Quest Diagnostics, Inc., 298
Fed. App'x 564, 565 (9th Cir. 2008) (concluding that requesting
disability accommodations and complaining about perceived
discrimination are protected activities).  Plaintiff, however,
has failed to establish a causal link between these protected
activities and her termination.

### d. Causal Connection

#### i.   Plaintiff's Request for Accommodations

There is nothing in the record to establish an
inference that Plaintiff's termination was causally connected to
her request for accommodations.  Plaintiff's arguments rely on
the fact that she requested reasonable accommodations and her
assertions that there was a delay or denial of the requested
accommodations.  In these circumstances, Plaintiff's arguments
are insufficient to raise an inference of causal connection
between her requests and her termination.

"Causation can be inferred from timing alone where an
adverse employment action follows on the heels of protected
activity."  See Davis v. Team Elec. Co., 520 F.3d 1080.  Here,
however, the timing of Plaintiff's notification of her injury and
request for accommodations, alone, does not support such an
inference.  Defendants knew of Plaintiff's disability over

fifteen months before she was placed on administrative leave in March 2009.  Plaintiff was injured in October 2007, one month after she started her position at the HDOT.  While on medical leave in December 2007, Plaintiff presented the HDOT with notification of her specific injuries.  Pl.'s CSF ¶ 12.

The majority of Plaintiff's requests for accommodations were made over a year before her placement on administrative leave.  Plaintiff requested her initial reasonable accommodations for parking and a flexible schedule in January 2008.  To support her requests made in January 2008, she filed two reports of her work capabilities in January and April 2008.  In her answer to Defendants' interrogatories, Plaintiff stated she first requested a personal printer in the first quarter of 2008 and a second request in July 2008.  See Defs.' Reply Ex. NN, at 11.  Thus, temporal proximity does not support an inference of causation between these requests and Plaintiff's termination.  See Tatum v. Schwartz, 405 Fed. App'x. 169, 171 (9th Cir. 2010) ("Temporal proximity of one year—measured from the date of [Plaintiff's] complaint until the date of her work assignment—is insufficient to establish an inference of retaliation without additional evidence."); Manatt v. Bank of Am, NA, 339 F.3d 792, 802 (9th Cir. 2003) ("While courts may infer causation based on the proximity in time between the protected action and the allegedly retaliatory employment decision, such an inference is not

possible in this case because approximately nine months lapsed between the date of Manatt's complaint and the Bank's alleged adverse decisions.") (internal and quotations citations omitted).

The only request made near Plaintiff's placement on administrative leave was her February 2009 request for a glare screen, leg rest, and lumbar support cushion. In light of the fact that Defendants had notice of Plaintiff's disability over a year prior, Plaintiff had made several accommodation requests over a year prior, and the minor nature of this request, it is insufficient to raise an inference of causation based on timing alone.

Moreover, the record reveals that Defendants did provide Plaintiff's requested accommodations, or at the least made a good faith effort to provide Plaintiff's requested accommodations. Plaintiff has not demonstrated that she was denied her requested accommodations for parking, flex-time, a leg rest, a glare screen, and a lumbar support cushion. Plaintiff also has not presented evidence that she requested her printer as an accommodation for her disability.

Plaintiff alleges she first requested parking in January 2008 from Gorospe and Domingo. Pl.'s Opp'n 10. She claims Gorospe told her parking in close proximity was not available at the time. Id. Domingo asserts that his receipt of Plaintiff's Request of Work Capabilities in April 2008 was the

52

first time he became aware Plaintiff was requesting accommodation

for parking.  Domingo Declaration ¶ 6.  Plaintiff admits that she

first brought in a note from her doctor which specifically asked

for parking in close proximity in March or April of 2008.  Pl.'s

Dep. 110:10-14.

        Plaintiff further admits that she did not approach

Domingo about parking from January until April 2008, and that

when she asked Domingo about her parking request in April 2008,

he provided her a request form within days.  Pl.'s Opp'n 14.

Plaintiff returned her completed parking request form to Domingo

on May 2, 2008.  On May 20, 2008, Dau approved Plaintiff's

application.  See SAC ¶ 40; Defs.' Mot. Ex. FF.  There were two

parking list, a priority list (for director, deputies, their

assistants, and division and office heads) and a "general list"

for all other people.  Defs.' Mot. Ex. D.  The parking is not

just for HDOT employees, but for "other employees in the

vicinity, including the DLIR, Tax, AG, and DAGS."  Id. at 110.

Persons with disabilities move ahead of all others on the general

list, where a non-disabled person on the list must wait 5-10

years for a parking spot.  Id. at 107.

        At the time of Plaintiff's placement on the parking

list, no parking spaces were available because of resurfacing of

several parking lots.  See Dau Declaration ¶ 8; Defs.' Mot. Ex.

D, at 110-14.  Plaintiff was given parking as soon as a space

became available on August 1, 2008.  Id. at 13.  In response to Domingo's e-mail to Plaintiff informing Plaintiff of her parking space assignment beginning August 1, 2008, Plaintiff responded: "Hurray!!!  Thank you so much for facilitating my parking in close proximity! . . . I am extremely appreciative of your efforts Rey.  I sincerely believe it made a difference."  Id. at 13.

In sum, the record reveals a good faith effort to accommodate Plaintiff's request for parking, which was actually provided to her within roughly three months of her completing a parking request form notwithstanding the delay caused by the resurfacing problem.

The record further reveals that Plaintiff was granted flex-time by April 28, 2008, see Defs.' Mot. Ex. I, and Plaintiff does not dispute she was granted flex time in June 2008.  Pl.'s CSF ¶ 14.  Although the record reveals that in a few instances she had to leave before an eight hour workday due to other OCR employees leaving early, these few instances over more than a year do not rise to the level of a denial of a reasonable accommodation.  Moreover, Plaintiff has presented no evidence that she was ever reprimanded or disciplined for failing to work a full eight-hour workday.

With regard to the printer, the record corroborates Domingo's declaration that Plaintiff did not request a printer as

54

an accommodation, but because of privacy and confidentiality concerns.  Particularly, Plaintiff's e-mail requesting a printer contained the subject line "Confidentiality and Printers" and only raised an issue of confidentiality.  Defs.' Mot. Ex. R., at 30.  Domingo's response denying this request states nothing about Plaintiff's disability, but that he was not concerned with other OCR employees seeing Plaintiff's confidential documents as long as the contents stayed in the office.  <u>Id.</u>  Domingo stated that he did, however, discourage "extended discussions of cases with other staff."  <u>Id.</u>  Significantly, Plaintiff's reply e-mail told Domingo "thanks" and that his response provided her with "guidance when curiosity gets the best of certain folks."  <u>Id.</u> It did not mention anything about her need of the printer as an accommodation or pain in getting out of her chair to retrieve documents from the shared printer.  <u>Id.</u>  Plaintiff has produced no evidence that she requested a personal printer as a disability discrimination.

With regard to the glare screen, leg rest, and lumbar support cushion, Defendants submitted evidence these were provided to Plaintiff.  Defendants submitted e-mails that establish that on February 12, 2009, Plaintiff was given a leg rest and Domingo requested that a computer glare screen and lumbar support be purchased for her.  <u>See</u> Defs.' Mot. Ex. E, at 55-57.  Defendants submitted a declaration from Domingo that he

provided the three requested accommodations for Plaintiff. Domingo Declaration ¶ 11.  In her opposition, Plaintiff states that the HDOT provided her a broken leg rest and a broken glare screen, but that she never received the requested lumbar support cushion.  Pl.'s Opp'n at 17.  Plaintiff, however, submitted no evidence to support her contention and rebut Defendants' evidence.  There is no indication in the record that Plaintiff complained about the quality of the allegedly broken leg rest or allegedly broken glare screen.  Plaintiff did not mention the leg rest, glare screen, or lumbar support cushion in her declaration. She also did not mention them in her responses to interrogatories asking what accommodations she requested and how she was discriminated against based on a disability.  Defs.' Mot. Ex. NN. Consequently, Defendants evidence establishes that at the least, Defendants made a good faith effort to provide Plaintiff with the accommodations requested in February 2009.

Consequently, neither the timing of nor response to Plaintiff's accommodation requests supports an inference that Plaintiff's termination was causally related to such requests.

### ii.  Plaintiff's EEOC charges

Temporal proximity is also lacking between Plaintiff's EEOC charges and her termination.  Plaintiff was already placed on administrative leave and under investigation for misconduct that ultimately resulted in her termination before she filed her

first EEOC charge.  Plaintiff's second EEOC charge was filed after she was notified of her termination.  Thus, she has failed to show any causal link between the EEOC charges and her termination.

Moreover, as discussed _supra_, the record reveals that Defendants proffered a legitimate nondiscriminatory reason for these adverse actions, _i.e._, Plaintiff's misconduct of knowingly filing false complaints against her co-workers.  Plaintiff has failed to establish that this reason was pretextual. Accordingly, Plaintiff has failed to set forth a viable claim for ADA retaliation.

### b.  Title II Claims

As discussed with respect to the HDOT, it is unclear whether Plaintiff seeks to assert a claim under Title II of the ADA.  As with Plaintiff's claim against the HDOT, to the extent that Plaintiff is seeking to assert such a claim against Okimoto, that claim fails because the Ninth Circuit has held that "Title II does not apply to employment."  <u>Zimmerman</u>, 170 F.3d at 1184 (9th Cir. 1999).

### III. Equal Protection Claim

Plaintiff alleges that Defendants violated the Equal Protection Clause of the Fourteenth Amendment by subjecting her to disparate treatment due to her disability and her role as an EEO Specialist who acted in accordance with all laws.  SAC ¶ 163.

Defendants assert that Plaintiff's claim fails as a matter of law because there is no cause of action directly under the Constitution and Plaintiff did not cite 42 U.S.C. § 1983, an enabling statute to support constitutional claims.  Defs.' Mot. Mem. 35.  Defendants contend that even if Plaintiff had cited § 1983, Eleventh Amendment immunity bars Plaintiff's claim.  <u>Id.</u>

## A.   Direct Cause of Action Under the Constitution

Defendants are correct that there is no direct cause of action under the United States Constitution and that a litigant complaining of a violation of a constitutional right must utilize 42 U.S.C. § 1983.  <u>Arpin v. Santa Clara Valley Transp. Agency</u>, 261 F.3d 912, 925 (9th Cir. 2001); <u>see</u> <u>Azul-Pacifico, Inc. v. City of Los Angeles</u>, 973 F.2d 704, 705 (9th Cir. 1992) ("Plaintiff has no cause of action directly under the United States Constitution.  We have previously held that a litigant complaining of a violation of a constitutional right must utilize 42 U.S.C. § 1983.");  <u>Ward v. Caulk</u>, 650 F.2d 1144, 1147 (9th Cir. 1981) (holding that Plaintiff had no direct cause of action under the Constitution).  Thus, summary judgment for Defendants is proper on Plaintiff's Equal Protection claim.

Plaintiff stated in her opposition that she was not suing Okimoto under § 1983.  Pl.'s Opp'n 40.  With respect to the HDOT, even if Plaintiff had brought a § 1983 claim, summary judgment would be proper for Defendants.

### B.   Section 1983 Claim

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Sovereign immunity prohibits a § 1983 claim against the HDOT.  It is well settled that claims under § 1983 are limited by the scope of the Eleventh Amendment.  In Will v. Michigan Department of State Police, 491 U.S. 58 (1989), the Supreme Court held that "States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes" are not "persons" under § 1983.  Id. at 70-71.  The HDOT is an "arm of the state" and thus is immune from a § 1983 claim.  See Natural Res. Def. Council v. Cal. Dep't of Transp., 96 F.3d 420, 423 (9th Cir. 1996) (concluding that the Eleventh Amendment barred all claims against the California Department of Transportation for alleged violations of the Clean Water Act); Stephens v. Ga. Dep't of Transp., 134 Fed. App'x 320, 324 (11th Cir. 2005) ("As an arm of the state, the HDOT is entitled to the same sovereign immunity of the state itself."); see also State of Haw. Dep't of Transp., Airports Div. v. Ill. Union Ins. Co., Civ. No. 10-00263 SOM-LEK,

2010 WL 3156050, at *4 (D. Haw. Aug. 6, 2010) (holding that the HDOT, Airports Division is an arm of the State for diversity purposes).

## **CONCLUSION**

For the foregoing reasons, the Court GRANTS summary judgment in favor of Defendants on all claims.


IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 29, 2012.



_____
Alan C. Kay
Sr. United States District Judge

Elizabeth-Ann K. Motoyama v. State of Hawaii, Dep't of Transportation, et al., Civ. No. 10-00464 ACK-RLP; Order Granting Defendants' Motion for Summary Judgment